J-A20026-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JAMES FARMER | : | |
| | : | |
| Appellant | : | No. 2335 EDA 2022 |

Appeal from the Judgment of Sentence Entered July 25, 2022
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0008755-2018

BEFORE: LAZARUS, P.J., PANELLA, P.J.E., and DUBOW, J.

MEMORANDUM BY PANELLA, P.J.E.: **FILED DECEMBER 10, 2024**

James Farmer appeals from the judgment of sentence entered on July 25, 2022, for his convictions of murder of the first degree, firearms not to be carried without a license, carrying firearms on public streets or public property in Philadelphia, and possessing instruments of crime.[1] Farmer argues his confrontation rights were violated, that the Commonwealth committed prosecutorial misconduct in its closing argument to the jury, and the verdict was both insufficient and against the weight of the evidence. After careful review, we affirm on the basis of the well-written opinions of the trial court.

The parties are familiar with the factual basis for Farmer's convictions. Briefly, Farmer's convictions are related to his actions in shooting and killing

_____

[1] 18 Pa.C.S.A. §§ 2502(a), 6106(a)(1), 6108, and 907(a), respectively.

Duwhan Gilbert ("victim" or "decedent") on June 14, 2018. The trial court provides a thorough procedural and factual background in its March 31, 2023 opinion. Therefore, we see no reason to restate it here.

Farmer raises three issues for review:

1. Whether the [t]rial [c]ourt abused its discretion by admitting Devin Solomon's out of court, videotaped statement under the forfeiture by wrongdoing doctrine, thereby violating Mr. Farmer's right to confrontation under the United States and Pennsylvania Constitutions?

2. Whether the Commonwealth engaged in prosecutorial misconduct by repeatedly arguing that Mr. Farmer lied, thereby forming a fixed bias and hostility toward Mr. Farmer such that the jury was unable to appropriately weigh the evidence in this case?

3. Whether the [t]rial [c]ourt abused its discretion when it denied Mr. Farmer's challenge to the sufficiency and the weight of the evidence?

Appellant's Brief, at 10.

Farmer first argues the trial court erred in allowing the Commonwealth to play the video recorded statement of witness, Devin Solomon, during trial, because this violated his confrontation clause rights. **See** Appellant's Brief, at 17. Farmer next claims the Commonwealth committed prosecutorial misconduct as the prosecutor stated Farmer lied during its closing argument to the jury. **See id.** at 30. Finally, Farmer claims his convictions are against the weight of the evidence because the Commonwealth presented insufficient evidence to establish his identity as the shooter. **See id.** at 34-35.

Our applicable standards of review are as follows:

> On appeals challenging an evidentiary ruling of the trial court, our standard of review is limited. A trial court's decision will not be reversed absent a clear abuse of discretion. An abuse of discretion is not merely an error in judgment, but rather where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

*Commonwealth v. King*, 959 A.2d 405, 411 (Pa. Super. 2008) (citations and quotation marks omitted). "Confrontation Clause issues present a pure question of law, and our standard of review is *de novo*." *Commonwealth v. Grush*, 295 A.3d 247, 250 (Pa. Super. 2023) (citations omitted).

"Our standard of review for a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion." *Commonwealth v. Bedford*, 50 A.3d 707, 715 (Pa. Super. 2012) (*en banc*) (citation omitted). A defendant is not entitled to a perfect trial and, as such, "[n]ot every inappropriate remark by a prosecutor constitutes reversible error." *Id.* (citation omitted).

It is well-established that "[a] motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court." *Commonwealth v. Dewald*, 317 A.3d 1020, 1037 (Pa. Super. 2024) (citation omitted). However, "[o]n appeal, our review is distinct from the standard of review applied by the trial court. We do not review the underlying weight of the evidence question. Instead, we examine the judge's exercise of discretion in ruling on that claim." *Commonwealth v. Martin*, 323 A.3d 807, 823 (Pa. Super. 2024) (brackets and internal citations and quotation marks omitted).

- 3 -

Regarding a claim asserting insufficient evidence to sustain a conviction, our scope and standard of review is as follows:

> The standard we apply is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilty may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing on the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Orr*, 38 A.3d 868, 872-73 (Pa. Super. 2011) (*en banc*) (emphasis, citations, brackets, and ellipsis omitted).

Finally, as Farmer is only challenging the element of identity, we do not elaborate on the elements required for his convictions. We simply note "[i]n addition to proving the statutory elements of the crimes charged beyond a reasonable doubt, the Commonwealth must also establish the identity of the defendant as the perpetrator of the crimes." *Commonwealth v. Smyser*, 195 A.3d 912, 915 (Pa. Super. 2018) (citation omitted). Furthermore, "any indefiniteness and uncertainty in the identification goes to its weight. Direct

evidence of identity is, of course, not necessary and a defendant may be convicted solely on circumstantial evidence." *Id.* (citation omitted).

After our thorough review of the record, the parties' briefs, and the Honorable Charles A. Ehrlich's in-depth opinions dated March 31, 2023, and August 4, 2023, we conclude the trial court did not abuse its discretion and committed no error of law in its analysis. Therefore, we adopt the trial court's opinions as our own. *See* Trial Court Opinion, 3/31/23, at 18-25 (thoroughly evaluating the evidence admitted at the hearing on the Commonwealth's motion to introduce Devin Solomon's videotaped police statement, finding Solomon was unavailable, and concluding Farmer forfeited his right to confrontation because he was responsible); Trial Court Opinion, 8/4/23, at 6-17 (same); Trial Court Opinion, 3/31/23, at 25-28 (explaining the prosecutor's statement was improper, but did not have the effect of prejudicing the jury as the prosecutor backtracked slightly on his comments, the trial court gave curative instruction and reiterated during final instructions the defendant's credibility is for them to determine); *id.* at 29-33 (explaining why court found verdict not against the weight of the evidence).[2]

---

[2] We note the trial court did not evaluate the sufficiency of the evidence although it was raised in one of Farmer's supplemental Rule 1925(b) statements filed on April 24, 2023. There are two supplemental Rule 1925(b) statements filed on the same date, April 24, 2023, included in the supplemental certified record. The relevant Rule 1925(b) statement including a sufficiency claim was filed at approximately 6:55 p.m. Based on the trial court's meticulous review of the weight of the evidence, and our review of the record, we find sufficient evidence for Farmer's convictions.

We therefore affirm on the basis of the trial court's comprehensive opinions of March 31, 2023, and August 4, 2023.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/10/2024

Circulated 11/27/2024 01:21 PM

**FILED**

MAR 3 1 2023

Appeals/Post Trial
Office of Judicial Records

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION – CRIMINAL SECTION

| | | |
|---|---|---|
| Commonwealth of Pennsylvania | : | CP-51-CR-0008755-2018 |
| | : | |
| v. | : | |
| | : | |
| | : | SUPERIOR COURT NO: |
| James Farmer | : | 2335 EDA 2022 |

## OPINION

Ehrlich, J.

James Farmer, hereinafter referred to as "Appellant", was found guilty by a jury on July 22, 2022, of Murder of the First Degree, Possessing Instruments of Crime, and two (2) violations of the Uniform Firearms Act. This Court subsequently sentenced Appellant to a mandatory term of life imprisonment without the possibility of parole and a concurrent term of four (4) to eight (8) years of confinement. Appellant timely appealed his judgment of sentence, arguing that this Court erred in permitting the Commonwealth to present evidence pursuant to the forfeiture by wrongdoing doctrine and offer impermissible opinion regarding the veracity of evidence during closing argument. Appellant also claims that the verdict with respect to all charges is against the weight of the evidence. Appellant's claims are without merit and, accordingly, no relief is due.

1

Statement of Facts

On June 14, 2018, Duwhan Gilbert was shot and killed near Frankford Avenue in Philadelphia. Witnesses saw the shooter jump into a red pickup truck and speed away. One witness followed the truck and relayed its license plate and location to law enforcement. A short time later, police found the red pickup truck abandoned. Police apprehended an individual, Devin Solomon, after he attempted to enter the abandoned truck. Mr. Solomon gave a statement to police indicating that Appellant had given him the keys to the truck and instructed him to retrieve it. Appellant had borrowed the red pickup truck from his wife's cousin and made several calls to him after the homicide to try to conceal his connection to the truck. Appellant denied any wrongdoing, but cell phone location data placed him near the scene of the murder at the time it occurred, and his DNA was found in the red pickup truck. Appellant was subsequently arrested for his involvement in the murder of Mr. Gilbert.

Appellant was charged with Murder,[1] Possessing Instruments of Crime,[2] and three violations of the Uniform Firearms Act: Persons Not to Possess, Use, Manufacture, Control, Sell or Transfer Firearms,[3] Firearms Not to Be Carried Without a License,[4] and Carrying Firearms on Public Streets or Public Property in Philadelphia.[5] At trial, the Commonwealth presented eighteen (18) witnesses as part of its case-in-chief: Philadelphia Police Officers Tiffany Richardson, Mark Wilusz, and Piret Waymon; Philadelphia Police Detectives James Dunlap, Cherie Savoy, Thorsten Lucke, and Shawn Leahy; SEPTA Transit Police Officer Daniel Burgmann; Dr. Julia de la Garza-Jordan; Danielle Pileggi; Molly Leech; Michael McNeal;

---

[1] 18 Pa.C.S.A. § 2502.
[2] 18 Pa.C.S.A. § 907(a).
[3] 18 Pa.C.S.A. § 6105(a)(1).
[4] 18 Pa.C.S.A. § 6106(a)(1).
[5] 18 Pa.C.S.A. § 6108.

2

Tenisha Randall; Yazmin Ramos-Rivera; Thomas Petrowski; Jean Hess; David Gilbert; and David Solomon. Appellant testified on his own behalf and presented two (2) character witnesses: Markie Patterson and Darryl Browne. The trial evidence and testimony given at trial are summarized below.

On June 14, 2018, Danielle Pileggi and Molly Leech were both working as hair stylists at Creations Salon on Frankford Avenue in Philadelphia. Ms. Pileggi testified that she was working at her station in the salon when she heard gunshots and saw a man fall to the ground across the street. She later saw the man get picked up and taken away by a police officer. Ms. Leech also heard the gunshots and saw a larger man fall to the ground after being shot. She then witnessed the shooter get into a red truck which was parked in a Pizza Hut parking lot across the street. Ms, Leech clarified that she did not actually see the shooter holding a gun. N.T. 7/19/2022, at 83-101.

Thomas Petrowski testified that he was a passenger on a SEPTA bus driving northbound on Frankford Avenue when he heard several gunshots followed by loud screeching of tires. He looked out the window of the bus and caught a glimpse of a red Dodge pickup truck traveling southbound on Frankford Avenue at a high rate of speed. Mr. Petrowski exited the bus after it pulled over and flagged down a police officer standing in front of the TD Bank on Frankford Avenue. Mr. Petrowski told the officer that someone had been shot and provided a partial Pennsylvania license plate number. N.T. 7/21/2022, at 29-33. Philadelphia Police Officer Piret Waymon testified that she was the officer who received the information from Mr. Petrowski. Officer Waymon stated that she was at the TD Bank when she heard three (3) loud pings which prompted her to go outside to investigate. *Id.* at 34-41.

On June 14, 2018, Yazmin Ramos-Rivera and her husband were in a truck driving past the Pizza Hut on Frankford Avenue when they heard several gunshots. Ms. Ramos-Rivera

3

looked in the direction where she heard the gunshots, where she saw a man fall to the ground and a second man jump into a red truck and take off. After a SEPTA bus passed by, Ms. Ramos-Rivera told her husband to make a U-turn and follow the red truck. Ms. Ramos-Rivera called 9-1-1 to report the shooting and relay that she and her husband were currently chasing the truck. When they lost sight of the red truck, Ms. Ramos-Rivera and her husband went back to the location of the shooting. They were subsequently taken by police to the homicide unit to give statements. N.T. 7/20/2022, at 60-68.

SEPTA Transit Police Officer Daniel Burgmann testified that on the day of the shooting, he and his partner, Detective Bryan McCauley, responded to the report of a shooting that had occurred in the 4000 block of Wells Street in Philadelphia. They initially responded to assist with pulling video footage from the SEPTA bus that was on location, but subsequently heard a radio transmission giving information about the shooter's vehicle and license plate number. Officer Burgmann and Detective McCauley canvassed the nearby area and spotted a red Dodge pickup truck with the license plate matching what was called in. The truck was parked on Algon Avenue north of Hellerman Street and seemingly unoccupied. Officer Burgmann and Detective McCauley parked their vehicle across the street and radioed their findings in to the Philadelphia Police Department. N.T. 7/20/2022, at 106-112.

While waiting for other officers to arrive, Officer Burgmann and Detective McCauley observed a black male individual walking down the street toward the red pickup truck. The individual proceeded to the driver's side of the vehicle and opened the door. At this time, Officer Burgmann and Detective McCauley exited their vehicle, identified themselves as the police, and ordered the male individual out of the vehicle. Other officers subsequently arrived on scene and took the male individual into custody. Officer Burgmann confirmed that this male individual was

4

not Appellant. *Id.* at 112-115. Yazmin Ramos-Rivera and her husband were later escorted by police to the location where the red truck had been located. Ms. Ramos-Rivera testified that the individual the officers took into custody was wearing different clothes than the person she had originally seen enter the red truck following the shooting. *Id.* at 68-84.

Philadelphia Police Detective Thorsten Lucke, an expert in the field of video recovery and analysis, prepared a compilation video related to the shooting that occurred on June 14, 2018 at 4000 Wells Street. The first portion of the compilation video depicted a van entering the frame and pulling over onto Wells Street. A short time later, a red pickup truck entered view, stopped, then the view became obstructed when a SEPTA bus entered the frame. A photograph of the red pickup truck recovered on Algon Avenue was inserted into the video for comparison purposes. The next portion of the compilation video used footage from the SEPTA bus front camera and showed the red pickup truck passing the bus while a white pickup truck made a U-turn to follow the red pickup truck. The final portion of the compilation video showed the red pickup truck speeding away from the scene of the shooting just as the SEPTA bus came to a stop. N.T. 7/21/2022, at 78-100.

Philadelphia Police Officer Tiffany Richardson, who was assigned to the Crime Scene Unit, testified that she went to 4000 Wells St at 1:35 p.m. on June 14, 2018. Officer Richardson photographed the area where the shooting occurred and later photographed the area where the red pickup truck was located. Officer Richardson swabbed several areas in the red pickup truck and items within it for DNA. She also recovered and submitted for analysis fifteen (15) total pieces of ballistic evidence, including two (2) different types of fired cartridge casings and two (2) projectiles. N.T. 7/19/2022, at 45-79. Philadelphia Police Officer Mark Wilusz, who was assigned to the Firearms Identification Unit, testified that based on a review of the ballistics

5

evidence recovered from the location of the shooting, two (2) firearms had been used to facilitate the murder of the decedent, Duwhan Gilbert. N.T. 7/20/2022, at 86-106.

Dr. Julia de la Garza-Jordan, an Associate Medical Examiner with the City of Philadelphia Medical Examiner's Office, testified that autopsy of the shooting victim, Duwhan Gilbert, was completed by Dr. Daniel Brown, who had since retired. Dr. de la Garza-Jordan reviewed Dr. Brown's findings and testified that Mr. Gilbert had thirteen (13) gunshot wounds. Three (3) of Mr. Gilbert's gunshot wounds, two (2) in the head and one (1) in the right chest, would have been fatal. Dr. de la Garza-Jordan concluded that Mr. Gilbert's cause of death was multiple gunshot wounds, and his manner of death was homicide. N.T. 7/20/2022, at 7-42.

David Gilbert, the father of the decedent, Duwhan Gilbert, testified that he had a close relationship with his son. He spoke with him every day, including the morning of the shooting. Mr. Gilbert testified that his son was in the business of buying and selling vehicles and that on the morning of the shooting, his son was going to sell a van. The same van that the decedent was going to sell was located at the scene of the shooting. N.T. 7/21/2022, at 72-76.

Michael McNeal, who was the cousin of Appellant's wife, Tenisha Randall, testified that he originally rented the red Dodge pickup truck from June 1st to June 15th because his vehicle was in the shop. Mr. McNeal stated that Ms. Randall and Appellant called him on June 13, 2018 and asked to borrow the red pickup truck to help them move. Mr. McNeal agreed and testified that both Appellant and Ms. Randall came by that same day and picked up the truck. The following day, Mr. McNeal received a phone call from the rental facility where he rented the truck and learned that a police officer had come seeking information on who had rented the pickup truck because it was connected to a murder. Mr. McNeal was also told that the police officer wished to speak with him about the murder. N.T. 7/19/2022, at 103-111.

6

Mr. McNeal subsequently called Appellant to ask about what had happened. Mr. McNeal testified that Appellant told him that "things got out of hand." Mr. McNeal then asked Appellant to bring the truck back to him. Appellant told him that he would get someone to bring the truck back to him and hung up. Shortly later, Appellant called him back and explained that "Dell" had gotten locked up with the truck. Appellant asked Mr. McNeal if he would tell the police that he had given the truck to Dell and not to Appellant, to which Mr. McNeal refused. Appellant also asked Mr. McNeal if he would report the vehicle as stolen, to which Mr. McNeal again refused and stated that he wasn't getting involved. Appellant finally asked if Mr. McNeal could have his friend, who was employed at the rental facility, alter the records of the rental to reflect the vehicle being rented by someone else. Mr. McNeal refused to do this as well. *Id.* at 111-142.

Mr. McNeal also testified about Appellant's relationship with his wife, Tenisha Randall, and the decedent, Duwhan Gilbert. Mr. McNeal stated that Ms. Randall had cheated on Appellant with the decedent. Tenisha Randall testified that, at the time of trial, she was separated from her husband, Appellant. Ms. Randall explained that the decedent was the father of her two (2) children and that she had separated from the decedent around one (1) to two (2) years prior to the shooting. *Id.* at 123-126; 143-145.

Ms. Randall testified that in April 2018, approximately two (2) months before the shooting, her vehicle broke down and she called the decedent for help. She ended up staying the weekend with him and their children. During that weekend, Appellant filed a missing person's report after Ms. Randall failed to return home or reach out to Appellant and let him know where she was. Ms. Randall testified that she was unaware a missing person's report had been filed until after she returned home. When she returned, Ms. Randall told Appellant that she was with the decedent, which upset Appellant. Ms. Randall testified that she called the decedent, then

7

Appellant took the phone from her and walked away to speak with him. Ms. Randall did not overhear the conversation between Appellant and the decedent. *Id.* at 145-157.

Ms. Randall testified that she was very sick the week the shooting occurred and that she did not move from her bed. She also denied calling Mr. McNeal or accompanying Appellant to pick up the truck from Mr. McNeal the day before the shooting took place. Ms. Randall stated that she had never seen the truck prior to the trial. N.T. 7/20/2022, at 43-58.

Philadelphia Police Detective Cherie Savoy, who was assigned to the Gun Violence Task Force, testified that her job responsibilities included monitoring social media accounts for anything that dealt with gun violence. On March 25, 2022, Detective Savoy was monitoring Instagram when she found a video of an interview room within the homicide division which had been reposted on a public profile. Detective Savoy recognized the room because she had personally been in that room before. Detective Savoy sent the Instagram video up her chain of command, and it was eventually turned over to the homicide unit based on its relation to Appellant's case. Detective Savoy testified that she did not investigate the individual who had reposted the video and conducted no further investigation beyond forwarding the video. N.T. 7/21/2022, at 63-72.

Philadelphia Police Detective Shawn Leahy, the assigned investigator into the murder of Duwhan Gilbert, testified that he conducted a videotaped interview of a witness by the name of Devin Solomon in the court of his investigation. Mr. Solomon was interviewed because he had been spotted attempting to enter the red pickup truck abandoned near Algon Avenue within an hour of the murder. In the videotaped interview, Mr. Solomon declined to sign his witness statement and explained that he did not want to expose himself or the statements he had given to police. *Id.* at 101-111.

8

Detective Leahy testified that it was later brought to his attention that a portion of the videotaped interview with Mr. Solomon was posted on an Instagram profile. Detective Leahy alerted the Commonwealth about the Instagram post. Detective Leahy testified that he attempted to locate Mr. Solomon prior to trial by visiting his last known residence on July 10, 2022, and July 16, 2022. While there, he learned from Mr. Solomon's parents that they had not seen or spoken to their son since the video had been posted on Instagram about three (3) months earlier. *Id.* at 111-119.

David Solomon, the father of Devin Solomon, confirmed that he had not had any contact with his son for about three (3) months. At that time, Devin told him that Appellant had posted a video on Instagram calling Devin a snitch. Devin expressed to his father that he was scared and that he had to go. Mr. Solomon testified that he had not seen or heard from Devin since this conversation. Mr. Solomon was shown the Instagram video and testified that near the end, an Instagram handle appeared on screen with the words "lil dev" and some numbers. Mr. Solomon testified that he had heard "lil dev" as a nickname for his son. *Id.* at 120-124.

Philadelphia Police Detective James Dunlap, an expert in historical cell site analysis, testified that he prepared a report for a T-Mobile cell phone number attributed to Appellant for call records from June 12, 2018, to June 18, 2018. Detective Dunlap stated that he was asked to look at where the cell phone's approximate location was on the date and time of the shooting: June 14, 2018, at approximately 11:54 a.m. Detective Dunlap indicated that he would not be able to pinpoint the exact location of the cell phone but determine where it was within half of a square mile based on the cell tower utilized during phone calls. N.T. 7/20/2022, at 116-120; N.T. 7/21/2022, at 124-137.

9

Detective Dunlap testified that, based on his review of the call records and the cell towers Appellant's cell phone utilized, the cell phone's location moved from the west Philadelphia area on the morning of June 14, 2018, to the area in and around the crime scene. The phone then immediately moved to the area in and around 6500 Algon Avenue, where the red pickup truck was later recovered. Detective Dunlap explained that Appellant's cell phone placed calls at 10:57 a.m. and 11:32 a.m. which pinged cell towers about two- to four-tenths of a mile away from the crime scene. Appellant's cell phone then placed calls at 11:56 a.m. and 11:59 p.m. which showed it moving out of the area where the shooting occurred. From 12:01 p.m. to 12:50 p.m., the cellphone pinged cell towers near 6500 Algon Avenue. N.T. 7/21/2022, at 137-176.

Jean Hess, an expert in DNA analysis, authored a report dated January 10, 2022, in which she analyzed DNA swabs against reference samples from a buccal card of Appellant and a blood card for the decedent, Duwhan Gilbert. The DNA swabs were taken from the red Dodge pickup truck and items within it. One (1) swab was taken of the steering wheel, dashboard, and seat controls of the truck, which yielded a finding of a DNA mixture originating from at least four individuals, one of whom was male. Ms. Hess testified that the scenario in which the DNA mixture originated from Appellant and three (3) random, unrelated individuals was 104.3 billion times more likely than if it originated from four random, unrelated individuals in the African American population. N.T. 7/21/2022, at 42-48.

A second swab was taken from a 16-ounce Everfresh bottle collected from the front center cupholder. The DNA detected in this sample was consistent with the DNA profile obtained from Appellant, while the decedent was excluded as a source of the DNA detected in this sample. The next swab was taken from a 20-ounce Mountain Dew bottle also removed from the vehicle. Both Appellant and the decedent were excluded as contributors to the DNA mixture

10

detected in this sample. The same findings were found in relation to a swab of a V8 bottle recovered from the driver side front door pocket. The final swab was taken from a Snapple bottle collected from the passenger side rear floor. It was inconclusive whether the DNA detected in that sample belonged to Appellant or the decedent. *Id.* at 42-63.

Appellant testified on his own behalf and confirmed that he and Tenisha Randall were married. Appellant stated that Ms. Randall and the decedent, Duwhan Gilbert, had two children together and shared joint custody. Appellant testified that he had seen the decedent on multiple occasions but did not frequently spend time with him. Appellant recalled an argument between himself and Ms. Randall around April 2018 in which he left her and ignored her phone calls. After calming down, Appellant attempted to return Ms. Randall's phone calls and went to her home, but she did not answer the calls and she was not at her home. Because he was concerned, Appellant filed a missing person's report. After Ms. Randall returned to Appellant's home, she told Appellant that she had been with the decedent. Appellant testified that he spoke with the decedent on the phone and expressed his desire to be cordial with him because of the children he shared with Ms. Randall. Appellant testified that there was no "bad blood" between himself and the decedent and that he never met with the decedent in person after the phone call. N.T. 7/22/2022, at 24-33.

Appellant testified that on June 13, 2018, he reached out to Michael McNeal to borrow a pickup truck to move some stuff out of his apartment. That same day, he drove his vehicle to Mr. McNeal's shop, left it there, and took the red pickup truck. Appellant stated that he used the pickup truck to move some items that night and the following morning to his uncle's house on Magee Avenue. Appellant stated that on June 13, 2018, he was approached by Devin Solomon, who asked Appellant to borrow the pickup truck because he also had things he needed to move.

11

Appellant told him he could use the truck the following day. Appellant then followed up with Mr. Solomon on the next day to confirm that he still wished to borrow the truck. Appellant recalled meeting Mr. Solomon and one of his friends at a Wawa around the corner from his uncle's house on Magee Avenue, where they exchanged vehicles. *Id.* at 33-42.

Appellant testified that he later received a frantic phone call from Mr. Solomon that same day in which he asked Appellant if he had heard gunshots because there had just been a shooting. Appellant stated that he told Mr. Solomon that he had not heard any gunshots and inquired about whether Mr. Solomon was okay. Appellant testified that Mr. Solomon hung up the call and then called him back to give Appellant directions to the truck's location so Appellant could retrieve it. Appellant stated that he called Mr. McNeal to let him know that he had let someone borrow the pickup truck and that "stuff just apparently went left" after that person went to meet someone. During this phone call, Mr. McNeal told Appellant that he had learned from the rental place that the truck was of interest in an aggravated assault or attempted murder. *Id.* at 42-45.

Appellant admitted that he asked Mr. McNeal during this conversation whether he could change the paperwork to reflect that Mr. McNeal never rented that truck. Appellant also agreed that he told Mr. McNeal that things had gotten out of hand and that he never meant to get Mr. McNeal caught in the middle. Appellant conceded that he asked Mr. McNeal to report the pickup truck as stolen. Appellant explained that he asked Mr. McNeal to keep himself from being involved or associated with anything that occurred while Mr. Solomon was in possession of the pickup truck. *Id.* at 49-60.

Appellant testified that after this conversation with Mr. McNeal, he spoke to Mr. Solomon again and began driving to the location that Mr. Solomon had given for the truck. Appellant stated that he found the truck and parked near it. He then told Mr. Solomon to return

12

the truck. Appellant testified that Mr. Solomon agreed to return it to Mr. McNeal, but that he ended up getting locked up while attempting to do so. Appellant testified that he was somewhere else at the time Mr. Solomon approached the truck, but that he later drove by and saw Mr. Solomon handcuffed and being placed into a police vehicle. *Id.* at 46-47.

Appellant testified that he was at his uncle's house at the time of the shooting. He could not recall the exact address of his uncle's residence, only that it was somewhere on Magee Avenue. Appellant further testified that he did not see or speak with the decedent on June 13, 2018, or June 14, 2018. Appellant stated that he only learned that the decedent had been shot when he received a phone call on his wife's old cell phone, which he had in his possession. *Id.* at 47-49, 60-62.

Appellant was then asked about the videotaped interview of Mr. Solomon. At the time discovery was passed, Appellant recalled that he was proceeding *pro se*. Appellant stated that he never received discovery though because he had standby counsel and an investigator who met with each other. Appellant testified that he had seen the Instagram video depicting a portion of the videotaped interview of Mr. Solomon for the first time during his trial. Appellant denied having anything to do with the Instagram video being created and posted online. He agreed, however, that the video clearly said to "keep my name out ya'll mouth" and that Appellant's name was the only name stated in the video. Appellant described the Instagram video as humiliating and embarrassing for Mr. Solomon but not threatening toward him. *Id.* at 64-92.

Two (2) character witnesses also testified on behalf of Appellant. Markie Patterson, Appellant's cousin, testified to Appellant's reputation in the community as a peaceful and nonviolent person. Darryl Browne, a family friend of Appellant's, testified that he had known

13

Appellant for over ten years and that Appellant was known in the community for being a calm person who diffuses situations. *Id.* at 106-110.

The Commonwealth and Appellant's trial counsel stipulated to a certificate of non-licensure for Appellant. This certificate stated that Appellant did not have a valid license to carry firearms issued under the provisions of § 6109 of the Crimes Code, and that he did not have a valid sportsman's firearm permit issued under the provisions of § 6106(c) of the Crimes Code. The certificate was signed and sealed by the director of the Pennsylvania State Police and the police custodian of records. N.T. 7/21/2022, at 178-179.

### Procedural History

Prior to trial, the Commonwealth filed a motion seeking to introduce the statement of Devin Solomon under the forfeiture by wrongdoing doctrine. Appellant's trial counsel filed a motion to bar the introduction of Mr. Solomon's hearsay statement. This Court held a motion hearing on July 19, 2022, in which it granted the Commonwealth's motion. N.T. 7/19/2022, at 102. On July 22, 2022, after hearing all evidence, closing arguments from counsel, and jury instructions from this Court, a jury deliberated and found Appellant guilty of Murder of the First Degree, Possessing Instruments of Crime, Firearms Not to Be Carried Without a License (VUFA § 6106), and Carrying Firearms on Public Streets or Public Property in Philadelphia (VUFA § 6108). N.T. 7/22/2022, at 218-219. The Commonwealth *nolle prossed* the charge against Appellant of Persons Not to Possess, Use, Manufacture, Control, Sell or Transfer Firearms (VUFA § 6105). *Id.* at 223-224. The jury was polled upon Appellant's trial counsel's request and all twelve (12) jurors agreed with the verdict. *Id.* at 220-222.

This Court held a sentencing hearing for Appellant on July 25, 2022. The decedent's mother, aunt, and uncle gave impact statements to this Court. N.T. 7/25/2022, at 9-19.

14

Appellant's counsel argued that it was not necessary for this Court to impose any additional time beyond the mandatory life sentence. *Id.* at 5-6. The Commonwealth requested that this Court consider the actions Appellant took to avoid going to trial, including intimidating witnesses. *Id.* at 20-21. Appellant addressed this Court briefly and maintained his innocence. *Id.* at 22-23.

This Court subsequently sentenced Appellant to a mandatory term of life imprisonment without the possibility of parole on the Murder of the First Degree charge. *Id.* at 26. This Court also imposed concurrent sentences of two (2) to four (4) years on the VUFA § 6106 charge and one (1) to two (2) years each on the VUFA § 6108 and Possessing Instrument of Crime charges. *Id.* This Court also ordered restitution in the amount of $7,270. This Court addressed Appellant's witness intimidation tactics, stating "that Instagram video, which I found you were responsible for, goes right to the heart of the witness intimidation that is afflicting our city and the justice system." *Id.* at 25. This Court noted that Appellant's "actions clearly demonstrated that [he] didn't want this case decided in court. [He] didn't want the police to know the full story." *Id.*

Appellant's trial counsel filed a post-sentence motion on August 3, 2022, arguing that the verdict was against the weight of the evidence, which was insufficient to prove Appellant's guilt. This Court denied Appellant's motion without a hearing on August 5, 2022. On August 15, 2022, Appellant filed a *pro se* Notice of Appeal which was docketed by the Superior Court of Pennsylvania at 2336 EDA 2022. On August 23, 2022, this Court directed Appellant to file a 1925(b) Statement of Errors Complained of on Appeal. On August 24, 2022, this Court removed Jason Kadish, Esquire, as counsel for Appellant and appointed James Lloyd, Esquire, to represent Appellant on appeal.

On August 31, 2022, James Lloyd entered his appearance as counsel of record for Appellant and filed a timely notice of appeal from the judgement of sentence imposed by this

15

Court and the denial of Appellant's post-sentence motion which was docketed at 2335 EDA 2022. On September 2, 2022, this Court directed Appellant to file a 1925(b) Statement of Errors Complained of on Appeal. On September 20, 2022, Appellant filed an initial 1925(b) Statement of Errors along with a Request for Extension of Time to file a Supplemental 1925(b) Statement of Errors. On September 28, 2022, this Court granted Appellant's motion, ordering that a 1925(b) Statement of Errors be filed within twenty-one (21) days from the Appellant's counsel's receipt of all notes of testimony or within a reasonable time therefrom if there were extenuating circumstances. On December 6, 2022, the Superior Court dismissed the appeal docketed at 2336 EDA 2022 as duplicative of the appeal docketed at 2335 EDA 2022.

Appellant, through counsel, filed a Supplemental 1925(b) Statement of Errors on January 11, 2023. In his final 1925(b) Statement of Errors, Appellant raises the following issues:

1. The trial court erred when it permitted the Commonwealth to present evidence pursuant to the forfeiture by wrongdoing doctrine.

    a. The Commonwealth failed to establish by a preponderance of the evidence that defendant caused – or acquiesced in causing – the unavailability of Devon Solomon at trial. The evidence did not sufficiently establish that the Instagram video post that purportedly prompted Devon Solomon to fail to appear at trial was posted by, or at the request of defendant. Nor did the evidence sufficiently establish that defendant acquiesced in the posting of the Instagram video. The Detective testifying for the Commonwealth testified that she had no idea where the video came from. Defendant was incarcerated at all times relevant to the posting, testified that he never had a copy of the video which was posted to Instagram, and had no involvement in the posting of that video. Then Commonwealth did not establish though admissible, competent evidence that defendant ever had access to the video at issue. Rather, the Commonwealth attorney merely asserted – not under oath or during testimony subject to cross-examination – that he "believed" defendant was given a copy of the video, while incarcerated with no means to view, copy or transfer the video. The Commonwealth did not produce any evidence establishing any relationship or communication (direct or indirect) between defendant and the person who posted the Instagram video despite having access to defendant's cellphone records, defendant's recorded prison calls, defendant's prison visit logs, a

16

cellphone recovered from defendant's cell mate, and the identity of the person who posted the Instagram video. Moreover, there was no reference to defendant in the Instagram post, no reference to defendant's trial, and no reference to Solomon testifying. In addition, the Instagram post did not direct Solomon to refrain from testifying, but rather warned others no[t] to trust Solomon.

b. The Commonwealth failed to establish by a preponderance of the evidence that defendant intended that an action taken on defendant's behalf would cause Devon Solomon to not be available for trial. Solomon did not testify at the preliminary hearing in this matter – months before the Instagram video was posted. Solomon told police within hours of the shooting that he did not want his involvement in the case to be known at all. Solomon's highly suspicious actions on the day of the murder prompted police to suspect him of being involved in the crime. Under these circumstances it was unlikely that Devon Solomon would appear at trial and testify. There is no evidence that defendant intended to take – or acquiesce in – any action that would cause Solomon to fail to appear for trial because there was no indication that Solomon would testify at trial. The Commonwealth did not even present Solomon's testimony at the preliminary hearing.

2. The trial court erred and/or abused its discretion when it permitted the prosecutor – over the objection of defense counsel – to offer impermissible opinion regarding the veracity of evidence when he stated that defendant "lied[…], and he lied, and he lied". (Tr. 7/22/22, p. 182).

3. The verdict with respect to all charges in this matter is against the weight of the evidence.
    a. Specifically, at trial, no witness identified defendant as the person who shot decedent. No witness provided a description of the shooter. Defendant, and defendant's paramour both testified that there was no ill will between decedent and defendant and, thus, no motive for defendant to commit the crime. Surveillance video near the shooting did not establish defendant's presence at the crime scene, but rather his presence in a 15 by 15 square block radius near the area of the crime scene. The only person alleging that defendant was in possession of the truck seen fleeing from the shooting was a person arrested for being inside that vehicle a short time after the murder. That witness exculpated himself by blaming defendant, but then refused to sign a statement verifying that information and never appeared in court to testify under oath or affirmation. Defendant testified that he did not commit the crimes at issue and presented multiple, unrebutted witnesses establishing his good character and reputation. Viewed in the light of the entire record, the verdict shocks the conscience as the jury improperly ascribed greater weigh[t] to the video statement of Devon

17

Solomon the[n] to the remaining evidence set forth above which demonstrated defendant's innocence.

Appellant's Pa.R.A.P. 1925(b) Statement of Errors Complained of on Appeal.

## Discussion

**I.**    **As this Court concluded that Devin Solomon was unavailable at trial and Appellant was responsible for his unavailability, it properly permitted the Commonwealth to present evidence at Appellant's trial pursuant to the forfeiture by wrongdoing doctrine.**

Appellant first claims that this Court erred when it permitted the Commonwealth to present evidence pursuant to the forfeiture by wrongdoing doctrine. Appellant argues that the Commonwealth failed to establish by a preponderance of the evidence that he caused or acquiesced in causing the unavailability of Devin Solomon at trial. Appellant further argued that the evidence did not sufficiently establish that the Instagram video post of Mr. Solomon's statement to police prompted him to fail to appear at trial, nor did it establish that Appellant acquiesced in the posting of the video. Appellant asserts that the Commonwealth failed to establish that he ever had access to the video of Mr. Solomon's statement or draw any connection between Appellant and the individual who made the Instagram post.

Appellant further contended that the Instagram post did not have the effect of directing Mr. Solomon to refrain from testifying at Appellant's trial, as Mr. Solomon told police within hours of the shooting death of Duwhan Gilbert that he did not want his involvement in the case to be known at all. Appellant thus claims that the Commonwealth failed to establish that he intended that an action that would cause Mr. Solomon to not be available for trial. This Court properly determined that Mr. Solomon was unavailable at trial and that Appellant was responsible for his unavailability. Accordingly, Appellant's first claim is without merit and no relief is due.

18

Hearsay is defined as a statement that "the declarant does not make while testifying at the current trial or hearing" which is offered in evidence "to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c). Hearsay is not admissible at trial except as provided by the Pennsylvania Rules of Evidence. Pa.R.E. 802. A statement "offered against a party that wrongfully caused the declarant's unavailability" is not excluded by the rule against hearsay. Pa.R.E. 804(b)(6). A declarant is considered to be unavailable as a witness if the declarant "is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure" the declarant's attendance. Pa.R.E. 804(a)(5)(A).

Where the Commonwealth seeks to admit an unavailable witness's prior recorded testimony, a "good faith" effort to locate the witness must be established. *Commonwealth v. Jackson*, 344 A.2d 842 (Pa. 1975). "The test for a witness's unavailability is whether the prosecution has made a good faith effort to produce the live testimony of the witness. The length to which the prosecution must go to produce the testimony is a question of reasonableness." *Commonwealth v. Melson*, 637 A.2d 633, 638 (Pa. Super. 1994). The Supreme Court of Pennsylvania has stated that the Commonwealth is not required to "establish that the witness has disappeared from the face of the earth." *Commonwealth v. Blair*, 331 A.2d 213, 215 (Pa. 1975). Instead, it is "within the discretion of the trial court to determine what constitutes a good faith effort to locate a missing witness, and the decision of the court will not be overturned absent an abuse of discretion." *Commonwealth v. Lebo*, 795 A.2d 987, 990 (Pa. Super. 2002).

Furthermore, once it is established that the witness is unavailable, the previously recorded statement can be brought in during trial if there is a showing that the "statement offered against a party that wrongfully caused or acquiesced in wrongfully causing the declarant's unavailability

19

as a witness and did so intending that result." PA.R.E. 804(b)(6). To satisfy its burden under Rule 804(b)(6), the Commonwealth "must establish by a preponderance of the evidence that: "(1) the defendant ... was involved in, or responsible for, procuring the unavailability of the declarant ... and (2) the defendant ... acted with the intent of procuring the declarant's unavailability as an actual or potential witness." *Commonwealth v. King*, 959 A.2d 405, 414 (Pa. Super. 2008).

Prior to trial, the Commonwealth filed a motion seeking to introduce the statement of Devin Solomon under the forfeiture by wrongdoing doctrine. Appellant's trial counsel filed a motion to bar the introduction of Mr. Solomon's hearsay statement. This Court held a motion hearing on July 19, 2022 to decide the Commonwealth's motion. The Commonwealth called five (5) witnesses at this hearing: Philadelphia Police Detectives Cherie Savoy, Shawn Leahy, Michael Zanetich, and Patrick Smith; and David Solomon. Appellant testified on his own behalf.

Philadelphia Police Detective Cherie Savoy, who was assigned to the Gun Violence Task Force, testified that her job responsibilities included monitoring social media accounts for anything that dealt with gun violence. On March 25, 2022, Detective Savoy was monitoring Instagram when she found a post that contained a portion of a videotaped interview with a Commonwealth witness, Devin Solomon. The post was made by a public Instagram profile of a boxer who had a significant number of followers. Comments on the post echoed text superimposed over the video which referred to Mr. Solomon as a "rat." Detective Savoy testified that she passed the information about the Instagram post to the homicide division and conducted no further investigation herself. N.T. 7/19/2022 (Motion), at 6-20.

Philadelphia Police Detective Shawn Leahy, who was assigned to investigate the murder of Duwhan Gilbert, testified that he originally interviewed Devin Solomon, the subject of the

20

Instagram video post. Detective Leahy testified that he conducted a videotaped interview of Mr. Solomon after Mr. Solomon was apprehended trying to enter a red pickup truck. The red pickup truck had been spotting leaving the area where the homicide took place. Mr. Solomon told Detective Leahy that Appellant gave him the keys to the truck at a Wawa in Northeast Philadelphia and told him to retrieve it from its location near Algon Avenue. Detective Leahy testified that Mr. Solomon indicated to him that he did not want to give him a written signed statement. Mr. Solomon explained his fear that a signed statement could be released to the public and that he did not want his name attached to anything. Detective Leahy testified to the contents of the Instagram post and stated that Mr. Solomon could be heard indicating that Appellant was dangerous and still out there. The only name that Mr. Solomon mentioned in the recorded interview was Appellant's. *Id.* at 20-24.

In preparation for Appellant's trial, Detective Leahy attempted to serve a subpoena on Mr. Solomon on July 10, 2022. When he arrived at the address for Mr. Solomon, Detective Leahy encountered Mr. Solomon's parents. They indicated that they had not seen their son in about three (3) months and that Mr. Solomon's father alluded to a social media post which was threatening toward his son. Detective Leahy confirmed with Mr. Solomon's father that this social media post was the portion of his statement posted to Instagram and that Devin told his father that Appellant had put the video out. Detective Leahy also stated that Mr. Solomon's father told him that his son had been shot at on two (2) separate occasions in response to the Instagram video, although neither shooting was reported. Mr. Solomon's father told Detective Leahy that he had also been shot at because he was a witness in Appellant's case. Detective Leahy attempted to locate Mr. Solomon again on July 16, 20022, at the same location he had previously

21

visited. He was again told by Mr. Solomon's parents that they still had not had any contact with their son, nor were they aware of his current location. *Id.* at 24-30

Detective Leahy testified that he was aware of two searches that were conducted of Appellant's prison cell. The first search was conducted in March 2022 and yielded several items recovered, including a cell phone on Appellant's cellmate and a cell phone charger recovered from Appellant's person. This Court ordered the second search at a later date. Philadelphia Police Detective Michael Zanetich testified that the search of Appellant's cell was conducted by Officer Maurice Marlow on March 23, 2022. Officer Marlow came to Northeast Detectives on that date and provided Detective Zanetich with a recorded statement and signed memorandum documenting the recovery of a cell phone and a cell phone charger from Appellant's cell. *Id.* at 31-49.

David Solomon, the father of Devin Solomon, testified that while his son used to live with him, he had not seen nor heard from him in three (3) months. Mr. Solomon testified that around that time, Devin spoke to him about a threatening social media post. The Commonwealth showed Mr. Solomon the Instagram post and confirmed that was the same post that his son had showed him. Devin also told Mr. Solomon that there had been a hit put out on him by Appellant and that he had been shot at twice. That was the last time that Mr. Solomon had seen or heard from his son. *Id.* at 51-59.

Philadelphia Police Detective Patrick Smith testified that he and his partner, Detective Mark Shay, completed an absentia check for Devin Solomon. He and his partner checked the two addresses they had on file, called the two cell phone numbers they had listed for Mr. Solomon, called several area hospitals and prisons, and spoke with Mr. Solomon's mother. Despite these attempts, they were unable to locate Devin Solomon. *Id.* at 60-65.

22

Appellant testified on his own behalf and confirmed that he had previously been proceeding in his case *pro se*. Appellant stated that he received all paper discovery, but never received any video, including the videotaped statement of Devin Solomon. Appellant also testified that he did not have the capability to watch any video while incarcerated, although he conceded that incarcerated prisoners were capable of creating posts on social media sites. *Id.* at 68-70. This Court inquired with the Commonwealth about whether all discovery, including any video, was turned over to Appellant while he was proceeding *pro se*. The Commonwealth confirmed that all discovery, including video statements, were turned over to Appellant. The Commonwealth recalled that there was a specific additional discovery request for the videotaped interview of Mr. Solomon, and that it was turned over directly to Appellant in Court. This Court noted that while Appellant claimed to have never received this video, he never made this Court aware of his failure to receive it. *Id.* at 71-80.

After this Court heard argument from both the Commonwealth and Appellant's trial counsel, it granted the Commonwealth's motion to introduce the statement of Devin Solomon under the forfeiture by wrongdoing doctrine. This Court explained that Appellant was the only person who stood to benefit from the dissemination of Mr. Solomon's statement on social media. This Court noted that the testimony of Mr. Solomon's father established that Devin saw the video posted on social media, expressed that he had been shot at and was afraid because of it, and subsequently disappeared. This Court did not find Appellant's testimony that he had never received the video to be credible and, accordingly, ruled that he was responsible for the release of the video and Mr. Solomon's unavailability as a witness. This Court ruled that the Commonwealth would be permitted to introduce Mr. Solomon's videotaped statement at

23

Appellant's trial. Additionally, this Court later ruled that the Commonwealth would also be permitted to introduce the Instagram post itself at trial. *Id.* at 82-105; N.T. 7/21/2022, at 7-13.

Devin Solomon's videotaped statement plainly constituted hearsay. The Commonwealth nonetheless sought to introduce the statement on the basis that it was excluded by the rule against hearsay because it was being offered against Appellant, who had wrongfully caused Mr. Solomon's unavailability. Several witnesses testified that good faith efforts were taken to locate Mr. Solomon prior to Appellant's trial. Detective Shawn Leahy made two (2) attempts to locate at Mr. Solomon at his last known residence. Philadelphia Police Detectives Patrick Smith and Mark Shay completed a thorough absentia check for Devin Solomon in which they checked multiple addresses, called all known phone numbers, and reached out to several area hospitals and prisons. Finally, Mr. Solomon's parents confirmed that they had not heard from Devin since he showed his father a threatening social media post approximately three (3) months before Appellant's trial.

Accordingly, this Court properly concluded that Devin Solomon was "unavailable" as a witness for Appellant's trial. The social media post which caused Devin Solomon's unavailability was highly incriminating to Appellant. The post, made on Instagram, contained portions of Mr. Solomon's videotaped statement to police in which he mentioned Appellant by name and referred to him as dangerous. In his statement, Mr. Solomon explained that Appellant had told him to retrieve the vehicle used in the murder of the decedent, Duwhan Gilbert. Text superimposed over the video referred to Mr. Solomon as a "rat" and stated, "keep my name out ya'll mouth." This Court agreed with the Commonwealth's recollection that all discovery, including the video of Mr. Solomon's statement, was passed directly to Appellant while he was

24

in court representing himself *pro se*. Appellant was the only person who to stood to benefit from releasing the video publicly.

This Court thus properly concluded that Appellant had access to the video and was responsible for its release. The videotaped statement with superimposed captions were later posted to Instagram on a public profile with many followers. Devin Solomon saw the threatening post and became afraid for his life after he was shot at on multiple occasions. The Commonwealth therefore established by a preponderance of the evidence that Appellant was both involved in procuring the unavailability of Devin Solomon at his trial and acted with the intent of procuring his unavailability as either an actual or potential witness. Accordingly, this Court properly permitted the Commonwealth to present both Mr. Solomon's videotaped statement and the Instagram post at Appellant's trial pursuant to the forfeiture by wrongdoing doctrine. Appellant's first claim is therefore without merit.

## II. This Court took appropriate steps to address the impact of the Commonwealth's potentially improper remarks and prevent the jury from being prejudiced.

Appellant next claims this Court abused its discretion when it permitted the Commonwealth to offer impermissible opinion regarding the veracity of evidence when it stated during closing argument that Appellant "lied, and he lied, and he lied" over the objection of Appellant's trial counsel. The Commonwealth's remarks did not have the effect of prejudicing the jurors against Appellant in such a manner as to prevent them from properly weighing evidence and rendering a true verdict. Accordingly, Appellant's second claim is without merit and no relief is due.

It is improper for a prosecutor to express a personal belief as to the credibility of the defendant or other witnesses. *Commonwealth v.* Koehler, 737 A.2d 225 (Pa. 1999). A prosecutor may, however, make fair comment on the admitted evidence and provide fair rebuttal to defense

25

arguments. *Commonwealth v. Spotz*, 47 A.3d 63, 97 (Pa. 2012). Additionally, not every "unwise, intemperate, or improper remark" made by a prosecutor mandates the grant of a new trial. *Commonwealth v. Cox*, 983 A.2d 666, 687 (Pa. 2009). The effect of the prosecutor's remarks must be evaluated in the context and atmosphere of the entire trial. *Commonwealth v. Stoltzfus,* 337 A.2d 873, 882 (Pa. 1975).

Reversible error occurs "only when the unavoidable effect of the challenged comments would prejudice the jurors and form in their minds a fixed bias and hostility toward the defendant such that the jurors could not weigh the evidence and render a true verdict." *Cox*, 983 A.2d at 687. To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial. *Id.* at 685 (quoting *Greer v. Miller*, 483 U.S. 756, 765 (1987)). Finally, it is well settled that a jury "is presumed to follow the trial court's instructions." *Commonwealth v. Cash*, 137 A.3d 1262, 1280 (Pa. 2016).

Before Appellant's trial counsel or the Commonwealth gave their closing arguments, this Court instructed the jury as follows:

> The next step in our trial is for counsel to make their closing arguments to you. And even though these arguments are not evidence, they are very important, so I'm going to ask you to pay careful attention to them.
>
> When counsel makes a closing argument, what they typically do is review the evidence with you, and ask you to draw certain inferences from that evidence. That can be very helpful to you in evaluating the case.
>
> I do need you to keep in mind, however, that you're not bound by counsel's recollection of the evidence nor are you bound by counsel's perspective of what the evidence in the case shows. It is your recollection of the evidence, and yours alone, that must guide our deliberations in this case.

N.T. 7/22/2022, at 111-112.

Subsequently, Appellant's trial counsel gave his closing argument to the jury. In his argument, counsel principally focused on the lack of certain pieces of evidence and suggested

26

that the Commonwealth had not met its burden to prove Appellant guilty beyond a reasonable doubt. *Id.* at 113-137. Counsel then moved onto talking about "evaluating credibility" and emphasized the reputation evidence presented by the two (2) characters witnesses for the defense. *Id.* at 137-140. Appellant's trial counsel next discussed Appellant's testimony and told the jury that it would see that Appellant's account of what happened "holds water" even when compared with the testimony of the Commonwealth's witnesses. *Id.* at 141-143.

In its closing argument, the Commonwealth argued that the testimony and evidence presented at trial established that Appellant ruthlessly killed the decedent, Duwhan Gilbert, in a "premeditated, vicious attack" and subsequently tried to cover up his involvement in the crime. *Id.* at 147-181. The Commonwealth highlighted how aspects of Appellant's testimony were inconsistent with the testimony and evidence presented by other witnesses. *Id.* The Commonwealth then noted that because Appellant had chosen to testify, the jury had the ability to evaluate his credibility. *Id.* at 181-182.

The Commonwealth continued: "His credibility is shot, ladies and gentlemen. He did not tell you the truth about anything. He lied, and he lied, and he lied." *Id.* at 182. Appellant's trial counsel objected to the Commonwealth's statement. *Id.* This Court stated that it was "up to the jury to determine that" before permitting the Commonwealth to proceed with the remainder of its closing argument. *Id.* The Commonwealth then reminded the jury that they were "at the point in the case where it is about to be up to you" and asked the jury to find Appellant guilty of all charges. *Id.* at 182-183.

During closing instructions to the jury, this Court gave the following instruction, based on Pennsylvania Suggested Standard Criminal Jury Instruction 3.09:

> The defendant took the stand as a witness. In considering the defendant's testimony, you're to follow the general instructions I gave you for judging the credibility of

27

any witness. You should not disbelieve the defendant's testimony merely because he is the defendant. In weighing his testimony, however, you may consider the fact that he has a vital interest in the outcome of this trial. You may take the defendant's interest into account, just as you would the interest of any other witness, along with all other facts and circumstances bearing on credibility in making up your minds what weight his testimony deserves.

*Id.* at 192.

The Commonwealth's characterization of Appellant's testimony as untruthful and subsequent statement that Appellant "lied, and lied, and lied" may be fairly construed as improper expressions regarding Appellant's credibility. While arguably improper, the remarks did not have the effect of prejudicing the jurors against Appellant in such a manner as to prevent the jury from properly weighing evidence and rendering a true verdict. The Commonwealth made these comments after discussing at length how Appellant's testimony was contradicted by the testimony and evidence presented by its other witnesses. This discussion was necessary to rebut Appellant's trial counsel's request to the jury to believe Appellant's version of events.

Furthermore, both this Court and the Commonwealth took steps to prevent any violations of Appellant's right to a fair trial. Before either Appellant's trial counsel or the Commonwealth gave their closing arguments, this Court told the jury that these arguments were not evidence. After Appellant's trial counsel objected to the Commonwealth's remarks, this Court reminded the jury that it was up to them to determine the credibility of Appellant's testimony. The Commonwealth also backtracked slightly, stating that the case was ready to be left for the jury's decision. This Court gave a closing instruction to the jury specifically outlining how they ought to consider and weigh Appellant's testimony given his vital interest in the outcome of the trial. As the jury was presumed to have followed this Court's instructions, this Court took appropriate steps to address the impact of the Commonwealth's potentially improper remarks and prevent the jury from being prejudiced. Appellant's second claim is therefore without merit.

28

**III.** **The jury's verdict finding Appellant guilty of Murder of the First Degree, Possessing Instruments of Crime, VUFA § 6106, and VUFA § 6108 was not against the weight of the evidence.**

Appellant's final claim is that the verdict with respect to all charges was against the weight of the evidence. In support of his claim, Appellant contends that no witness identified him as the individual who shot the decedent, Duwhan Gilbert. Appellant also argues that was no motive for Appellant to commit the crimes he was convicted of and no evidence to establish that he was present at the crime scene. Appellant also challenges the statement given by Devin Solomon, asserting that Mr. Solomon was in possession of the truck that witnesses observed fleeing from the murder and that he exculpated himself by blaming Appellant. Appellant argues that his testimony established that his innocence and that his character witnesses established his good reputation in the community. For these reasons, Appellant claims that the jury improperly ascribed greater weight evidence of Devon Solomon's statement and the verdict therefore shocks the conscience. Appellant's challenge to the weight of the evidence is without merit and, accordingly, no relief is due.

Pennsylvania law regarding appellate review of weight of the evidence claims is well settled. A claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. *Commonwealth v. Widmer*, 744 A.2d 745, 751-752 (Pa. 2000). A true weight of the evidence challenge "concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed." *Commonwealth v. Thompson*, 106 A.3d 742, 758 (Pa. Super. 2014). A new trial "should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Widmer*, 744 A.2d at 752. In determining if the verdict is against the weight of the evidence, the trial court does not "sit as the thirteenth juror" but instead must find that "notwithstanding all the

facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (2013) (quoting *Widmer,* 744 A.2d at 752).

When seeking to determine the credibility of the witnesses, the finder of fact is "free to believe all, none, or some of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Clemens*, 242 A.3d 659, 667 (Pa. Super. 2020). Reversal of a trial court verdict should therefore only be granted where the evidence is so "tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Commonwealth v. Akhmedov*, 216 A.3d 307, 326 (Pa. Super. 2019). A jury's verdict "shocks the judicial conscience" when it "causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench." *Id.* (quoting *Commonwealth v. Davidson*, 860 A.2d 575, 581 (Pa. Super. 2004)).

As the finder of fact in Appellant's case, it was the function of the jury to evaluate the evidence and determine the weight it should be given. The Commonwealth presented eighteen (18) witnesses as part of its case-in-chief against Appellant, while Appellant testified on his own behalf and presented two (2) character witnesses. The jury weighed this testimony and evidence in such a manner as to find Appellant guilty of Murder of the First Degree and other related charges. Appellant filed a post-sentence motion in which he argued that the jury's verdict was contrary to the weight of the evidence. After a review of the testimony and evidence presented at Appellant's trial, this Court denied Appellant's post-sentence motion without a hearing.

In denying Appellant's motion, this Court properly concluded that the jury's verdict did not shock the judicial conscience and was adequately supported by the weight of the evidence. As Appellant concedes in challenging the weight of the evidence, there was sufficient evidence for the jury to convict Appellant of all charges. Testimony from several witnesses established

30

that the decedent, Duwhan Gilbert, was shot near 4000 Wells Street in Philadelphia on June 14, 2018, around 11:54 a.m. N.T. 7/19/2022, at 83-101. The shooter was seen entering a red pickup truck and fleeing from the scene at a high rate of speed. N.T. 7/20/2022, at 60-68; N.T. 7/21/2022, at 29-33. Ballistics evidence revealed that two (2) firearms were used to shoot the decedent. N.T. 7/20/2022, at 86-106. The decedent received thirteen (13) total gunshot wounds, three (3) of which would have been fatal on their own. *Id.* at 7-42.

Police quickly located the red pickup truck that had fled the scene and found it abandoned. *Id.* at 112-115. Michael McNeal, the cousin of Appellant's wife, testified that he had originally rented the truck and loaned it to Appellant the day before the shooting. Mr. McNeal spoke with Appellant over the phone after he learned that the truck had been involved in a murder. Appellant told Mr. McNeal that "things got out of hand" and made several requests to conceal his association with the truck. In sequence, Appellant asked Mr. McNeal to lie to police for him, to report the truck as stolen, and to have the records of the truck rental altered. Mr. McNeal testified that he refused all of Appellant's requests. N.T. 7/19/2022, at 103-142.

Mr. McNeal also testified that Appellant's wife, Tenisha Randall, had cheated on Appellant with the decedent. *Id.* at 123-126. Ms. Randall herself testified that the decedent was the father of her two (2) children and that she had separated from the decedent around a year or two prior to his murder. Ms. Randall testified that she stayed the weekend with the decedent in April 2018, approximately two (2) months before his murder. After Ms. Randall did not contact Appellant and let him know where she was, Appellant filed a missing person's report. Appellant later had a conversation over the phone with the decedent after Ms. Randall returned to Appellant's home. *Id.* at 143-157. Appellant suggested that there was no "bad blood" between himself and the decedent despite this incident. N.T. 7/22/2022, at 24-33.

31

Historical cell site analysis conducted on the cell phone that Appellant admitted to carrying placed the cell phone in the area in and around the crime scene at the time that the murder occurred. This analysis showed that the cell phone then moved to the area in and around where the red pickup truck seen at the scene of the murder was abandoned and later recovered. This analysis was conducted based on phone calls made by Appellant on that cell phone. N.T. 7/21/2022, at 124-176. Furthermore, DNA analysis revealed that Appellant's DNA was very likely present on the interior of the red pickup truck and on a juice bottle collected from the front center cupholder in the truck. *Id.* at 42-63.

Devin Solomon was arrested by police after he attempted to enter the red pickup truck where it had been abandoned after the murder. N.T. 7/20/2022, at 112-115. A witness who had seen the shooter enter the red pickup truck after the murder stated that Mr. Solomon was wearing different clothes than the shooter she had seen. *Id.* at 68-84. Mr. Solomon gave a videotaped statement to police in which he explained that Appellant had asked him to retrieve the truck. Mr. Solomon refused to sign his statement inculpating Appellant out of fear that it would be released to the public. N.T. 7/21/2022, at 101-111.

The Commonwealth maintained that all discovery, including the videotaped interview of Mr. Solomon, was passed to Appellant in court while he was representing himself *pro se.* Appellant denied ever receiving this video but failed to ever bring this apparent omission to this Court's attention. A portion of Mr. Solomon's videotaped statement was later posted to Instagram on a public profile. Mr. Solomon could be heard in this statement using Appellant's name and indicating that he was dangerous. N.T. 7/19/2022 (Motion), at 6-80. Text superimposed over the video referred to Mr. Solomon as a "rat" and stated, "keep my name out ya'll mouth." N.T. 7/22/2022, at 64-92.

32

At a motion hearing to decide the admissibility of Mr. Solomon's statement under the forfeiture by wrongdoing doctrine, this Court ruled that Appellant was responsible for Mr. Solomon's unavailability after the contents of his videotaped statement were released publicly on Instagram. Police made several unsuccessful attempts to locate Mr. Solomon in preparation for Appellant's trial. Additionally, Mr. Solomon's father indicated that he had not seen or heard from him since he saw the Instagram post around three (3) months before Appellant's trial. Accordingly, both Mr. Solomon's statement itself and the Instagram post intimidating Mr. Solomon were both deemed admissible at trial and subsequently played for the jury at Appellant's trial. N.T. 7/19/2022 (Motion), at 82-105.

Appellant testified on his own behalf and maintained his innocence. His testimony was contradicted, however, in many ways by the Commonwealth's witnesses. Furthermore, there was forensic evidence in the historical cell site analysis and DNA analysis which corroborated the accounts given by the Commonwealth's witnesses. Furthermore, the Commonwealth's witnesses established a connection between Appellant and the decedent which gave him a motive to kill. As the decedent was shot thirteen (13) times and three (3) of those gunshots would have been fatal, the shooter's specific intent to kill the decedent was plain.

Accordingly, this Court thus determined Appellant's account of events to not be credible when compared with the compelling testimony and evidence presented by the Commonwealth. The testimony and evidence presented at trial was thus not so "tenuous, vague and uncertain" such that the jury's verdict finding Appellant guilty of Murder of the First Degree and related charges shocked the conscience of this Court. Appellant's challenge to the weight of the evidence is therefore without merit and no relief is due.

33

<u>Conclusion</u>

In summary, this Court has carefully reviewed the entire record and finds no harmful, prejudicial, or reversible error and therefore, nothing to justify the granting of appellant's request for relief. For the reasons set forth above, the judgment of this Trial Court should be affirmed.

By the Court:

3/31/23
Date

Honorable Charles A. Ehrlich

34

**Commonwealth v. James Farmer**
**CP-51-CR-0008755-2018**
**2335 EDA 2022**

**Affidavit of Service**

    I hereby certify that I am this day serving the foregoing Court Opinion upon the below named person(s) in the manner indicated below, which service satisfies the requirements of Pa.R.Crim.P. 114:

Defense Attorney:    **James Lloyd, Esquire**
    **1315 Walnut Street, Suite 1605**
    **Philadelphia, PA 19107**

Type of Service:    (x) First Class Mail    ( ) Certified    ( ) Personal Service

--------------------------------------------------------------------------------

District Attorney:    **Lawrence Goode, Esquire**
    **Chief, Appeals Unit**
    **District Attorney's Office**
    **3 South Penn Square**
    **Philadelphia, PA 19107**

Type of Service:    (x) First Class Mail    ( ) Certified    ( ) Personal Service

Date:   March 31, 2023

Colton D. Brown, Esq.
Law Clerk to the Honorable Charles A. Ehrlich